UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

DIONNE BRADLEY, on behalf of
DONALD BRADLEY, deceased,

    Plaintiff,

v.                                            Case No. 3:21cv681-LC-HTC

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

This case is before the Court for review of the final determination of the Commissioner of Social Security ("Commissioner") denying Donald Bradley's ("Claimant" or "Bradley") application for Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"). Upon review of the record, the undersigned finds the Administrative Law Judge's ("ALJ") denial of DIB is supported by substantial evidence and, thus, recommends the Commissioner's decision be AFFIRMED. As discussed below, while there may be some evidence supporting a determination of disability based on a visual impairment *after* the date last insured, the evidence up through that date supports the ALJ's denial of benefits.

I.   **BACKGROUND**

   A.   **Procedural History**

Bradley applied for DIB on May 27, 2016, alleging he became disabled on February 8, 2008, due to type 2 diabetes, high blood pressure, macular degeneration, ketoacidosis, diabetic neuropathy, and low back pain. T. 74-75.[1] The Commissioner denied the application initially and on reconsideration. T. 81, 92. Bradley subsequently died on March 29, 2017, T. 177, and his widow, Dionne Bradley ("Plaintiff"), was substituted as a party. T. 128.

After holding a hearing on August 21, 2018, ALJ Laura McHenry found Bradley had not been disabled under the Act at any time from February 8, 2008, the alleged onset date, to September 30, 2013, the date last insured ("DLI"). T. 28-36. The DLI is important because, as Plaintiff recognizes, "[u]nlike [Supplemental Security Income], which has no insured status requirement, a claimant must demonstrate disability on or before the last date on which [he] was insured in order to be eligible for DIB." *Moncrief v. Astrue*, 300 F. App'x 879, 880 n.1 (11th Cir. 2008) (citation omitted); *see also* 20 C.F.R. § 404.130. The Appeals Council denied Plaintiff's request for further review and, as a result, the ALJ's decision became the final decision of the Commissioner. T. 12-14. On April 19, 2021, Plaintiff filed a

---

[1] References to the record will be by "T.," for transcript, followed by the page number.

complaint with this Court seeking review of the Commissioner's decision. ECF Doc. 1.

Plaintiff raises three issues for review. She argues the ALJ erred by: (1) failing to find Bradley's visual impairment was severe; (2) formulating a residual functional capacity ("RFC") that is not supported by substantial evidence; and (3) failing to consider Dr. Briggs' and Dr. Stoltz's opinions regarding Bradley's functional limitations.

### B. Medical History[2]

In July 2007, Bradley visited the Briggs Vision Group with complaints of a recent decrease in vision with anterior uveitis and a history of diabetic retinopathy. T. 469. On October 26, 2009, Bradley was noted to have some diabetic retinopathy. T. 464. In a 40-Point Screening Test of Bradley's field of vision performed on November 2, 2009, he could see 37/40 points in the right eye and 36/40 points in the left eye. T. 465. In November 2010, Bradley reported decreased vision; Dr. Judson Briggs noted he had cataracts and "some retinopathy" but his corrected visual acuity was 20/40 in the right eye and 20/30 in the left eye. T. 463. On May 3, 2012, Dr. Briggs noted Plaintiff had grade two cataracts and 20/40 vision bilaterally. T. 462.

---

[2] Because the issues Plaintiff raises on appeal are primarily related to the ALJ's consideration of Bradley's visual impairment, the discussion of the medical evidence will mainly focus on that impairment.

Bradley presented to Briggs Vision Group with a left-eye hemorrhage in November 2012. T. 458. Dr. Briggs instructed him to perform "no running, no lifting" and referred him to Georgia Retina for further treatment. T. 458. On November 26, 2012, Bradley visited Georgia Retina for a consultation regarding the subretinal hemorrhage in his left eye. T. 309. He complained of a moderate to severe large red spot in his left eye that had lasted for a couple of days. T. 309. Visual acuity in Bradley's right eye was 20/50 but he could only finger count at three feet with his left eye. T. 309. Dr. Robert Stoltz diagnosed Bradley with proliferative diabetic retinopathy and nuclear sclerosis in both eyes, and recommended surgery "to clear the loculated subhyaloid hemorrhage in the left eye and allow for a more rapid visual recovery." T. 310-11.

On December 14, 2012, Bradley visited Georgia Retina again and complained the large red spot in his left eye was darker. T. 307. Visual acuity in his right eye was 20/40 but he could only detect hand movement with his left eye. T. 307. To treat the left-eye hemorrhage, Dr. Stoltz performed a vitrectomy on December 27, 2012, without complications. T. 305-06. On December 28, Dr. Stoltz noted Bradley had "[g]ood 1 day [post-operative] results"; Stoltz gave "post-op instructions," which included a recommendation that Bradley wear eye protection and not engage in strenuous activity. T. 304.

Bradley attended another post-operative checkup on January 7, 2013, and Dr. Stoltz noted he was "doing well after surgery." T. 301-02. Bradley reported double vision in his left eye but indicated it was improving. T. 301. Dr. Stoltz indicated Bradley had 20/40 visual acuity in the left eye, "no flashes or floaters, no distortion of vision," and was "able to perform all activities." T. 301. After the January 2013 appointment, Bradley did not seek treatment for his visual impairment for over a year.

As part of the disability application process, state agency medical experts reviewed Bradley's medical records and offered their opinions as to the severity of his condition. At the initial determination level, Dr. Alawode Oladele noted Bradley "does have evidence of diabetic retinopathy." T. 79. Nevertheless, Dr. Oladele found Bradley had failed to submit sufficient evidence relevant to the period before the September 30, 2013 DLI to render a decision. T. 79.

Dr. Richard Lawrence, an ophthalmologist, reviewed: (1) Dr. Stoltz's November 26, 2012 treatment note, which showed Bradley had proliferative diabetic retinopathy, a left-eye hemorrhage, and 20/50 visual acuity in his right eye; and (2) Dr. Stoltz's January 7, 2013 treatment note, which showed Bradley was "able to perform all activities" following the December 2012 left-eye vitrectomy and had 20/40 visual acuity in his left eye. T. 79, 301-02, 309-12. Based on a review of these records, Dr. Lawrence concluded Bradley's visual impairment was non-severe

before the DLI. T. 79. At the reconsideration level, Dr. Titanji relied on Dr. Lawrence's assessment to conclude Bradley's visual impairment was not severe.[3] T. 90.

## II. STANDARD OF REVIEW

Pursuant to 20 C.F.R. § 404.1520(a)(4), the Commissioner analyzes a disability claim in five (5) steps:

1. If the claimant is performing substantial gainful activity, he is not disabled.

2. If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3. If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least 12 months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent him from performing his past relevant work, he is not disabled.[4]

---

[3] Plaintiff initially argued Drs. Lawrence and Titanji "declined" to offer an opinion because of insufficient evidence. ECF Doc. 19 at 13. In her reply, Plaintiff says "the State agency findings are not clear." ECF Doc. 25 at 2-3 n.2. However, the undersigned agrees with the Commissioner that Drs. Lawrence and Titanji concluded the visual impairment was not severe.

[4] "[C]laimant bears the initial burden of establishing a severe impairment that keeps him from performing his past work." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).

5. Even if the claimant's impairments prevent him from performing his past relevant work, if other jobs exist in significant numbers in the national economy that accommodate the claimant's RFC and vocational factors, he is not disabled.

A federal court reviews the Commissioner's decision "to determine if it is supported by substantial evidence" and based upon proper legal standards. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005); 42 U.S.C. § 405(g). "The Commissioner's decision will not be disturbed if, in light of the record as a whole, it appears to be supported by substantial evidence, which is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support the conclusion." *Glasby v. Soc. Sec. Admin., Comm'r*, 2022 WL 1214015, at *1 (11th Cir. Apr. 25, 2022) (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004)). Under this narrow standard, the Court "may not make fact-findings, re-weigh the evidence, or substitute our judgment for that of the ALJ." *Woods v. Soc. Sec. Admin., Comm'r*, 2022 WL 1643244, at *1 (11th Cir. May 24, 2022) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)).

## III. DISCUSSION

### A. The ALJ's failure to find Bradley's visual impairment was severe is not reversible error

Plaintiff first argues the ALJ erred by concluding Bradley's visual impairment was not severe. *See Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 824 (11th Cir. 2010) ("A severe impairment is one that significantly limits the claimant's

ability to do basic work activities.") (citation omitted). The ALJ found Bradley's respiratory failure, diabetes mellitus, and hypertension were severe impairments but concluded his "decreased visual efficiency" was not severe because "the evidence of record" did not show it "significantly limit[ed] or produce[d] more than a minimal effect on the claimant's ability to perform basic work activities." T. 30-31.

When an ALJ determines a claimant has at least one severe impairment, the ALJ's failure to identify additional impairments as severe does not necessarily constitute reversible error. *See Heatly*, 382 F. App'x at 825 ("Nothing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe."). "Instead, at step three, the ALJ is required to demonstrate that it has considered all of the claimant's impairments, whether severe or not, in combination." *Id.*

Here, because the ALJ found Bradley had multiple severe impairments, the failure to designate Bradley's visual impairment as severe does not by itself require remand. The ALJ acknowledged that, in making her determination of Bradley's RFC, she "must consider all of the claimant's impairments, including impairments that are not severe." T. 29-30. Thus, what matters is whether the ALJ-formulated RFC adequately accounted for Bradley's visual impairment and is supported by substantial evidence.

**B.    Substantial evidence supports the ALJ's assessment of Bradley's RFC**

The ALJ concluded that, through the DLI, Bradley had the RFC to perform less than the full range of light exertional work.  T. 31.  The ALJ found Bradley's visual impairment allowed him "to perform tasks requiring frequent near visual acuity and occasional far visual acuity but [he must] avoid working near unprotected heights, around moving mechanical parts, or operating motor vehicles."  T. 31.  The ALJ also found Bradley was able to perform tasks which allowed alternating "between sitting and standing once every 30 minutes for 5 to 10 minutes without increasing time off task."  T. 31.

Plaintiff argues the ALJ could not have reached an RFC determination without a supporting medical opinion because the visual impairments at issue are complex.  ECF Doc. 19 at 14.  The ALJ, however, did not simply apply a "lay interpretation of the complex medical evidence," as Plaintiff suggests.  *Id.* at 15.  Instead, as discussed more below, the ALJ's finding regarding the severity of Bradley's visual impairment is supported by substantial evidence—namely, the opinion of Dr. Lawrence, the evidence regarding Bradley's ability to drive, and the treatment notes from Bradley's treating physicians, which showed successful treatment before the DLI, and then deterioration after the DLI.  Likewise, the ALJ's finding regarding Bradley's ability to sit and stand is supported by his self-reported activities and the treatment notes showing normal physical examinations and no doctor-imposed limitations.

1. **<u>State Agency Medical Experts</u>**

The ALJ based the RFC in part on the state agency medical experts, giving "partial weight" to the opinions of Drs. Oladele, Lawrence, and Titanji. T. 33. The ALJ stated their opinions showed "adequate visual acuity, medically managed hypertension, and no evidence of end organ damage, retinopathy, chronic neurological deficits, or chronic cardio-pulmonary conditions. T. 33. The ALJ also noted "[a]ll three of the medical examiners agreed that the evidence of record was either lacking of the severity alleged by the claimant, or insufficient to support such allegations." T. 33. Plaintiff contests the ALJ's reliance on the opinions of the state agency experts, claiming the ALJ mischaracterized the evidence when stating the opinions from Drs. Oladele, Lawrence, and Titanji showed "no evidence of . . . retinopathy[.]" T. 33. Plaintiff focuses heavily on this statement in the ALJ's decision to argue the RFC determination is not supported by substantial evidence.

Plaintiff is partially correct; the ALJ's statement is inaccurate, as the reports from both Dr. Oladele and Dr. Lawrence, as well as the rest of the medical record indicate Bradley was diagnosed with diabetic retinopathy. *However*, the ALJ's misstatement is not a reversible error. First, a diagnosis of retinopathy does not establish the functional limitations related to it. *See Wind v. Barnhart*, 133 F. App'x 684, 690 (11th Cir. 2005) ("[A] diagnosis or a mere showing of 'a deviation from purely medical standards of bodily perfection or normality' is insufficient; instead,

the claimant must show the effect of the impairment on her ability to work.") (quoting *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)). Second, the ALJ's statement may have been a scrivener's error because elsewhere in the written decision, the ALJ acknowledged there was evidence of retinopathy in the record. *See* T. 31 (noting Plaintiff testified at the hearing that "limitations secondary to . . . retinopathy prevented [Bradley] from performing work activity"). Third, the ALJ relied on the expert opinion of Dr. Lawrence, the state ophthalmologist, who referenced the retinopathy diagnosis but still concluded Bradley's visual impairment was not severe.

Based on the foregoing, the ALJ's misstatement does not require reversal because the ALJ considered Bradley's condition as a whole and formulated an RFC that was consistent with the evidence and Dr. Lawrence's opinion. *See Stacy v. Comm'r, Soc. Sec. Admin.*, 654 F. App'x 1005, 1008-09 (11th Cir. 2016) (holding "the ALJ's misstatements and omissions were harmless because the ALJ considered Stacy's visual limitations as a whole and applied the proper legal standard when assessing his RFC" and noting "[t]he RFC was consistent with Dr. Ponterio's assessment, despite the ALJ's misstatement of Dr. Ponterio's findings"). Thus, despite Plaintiff's critique, Dr. Lawrence's opinion supports the ALJ's finding

regarding the severity of Bradley's visual impairment before the DLI.[5]  *See* 20 C.F.R. § 404.1513a(b)(1) ("State agency medical . . . consultants are highly qualified and experts in Social Security disability evaluation.").

### 2. **Evidence related to driving**

The ALJ cited Bradley's driving ability to support her conclusions regarding the severity of his visual impairment. The ALJ noted Plaintiff testified at the hearing that Bradley stopped driving in 2012 but that was not upon the recommendation of a doctor. T. 32-33. Furthermore, records from Omni Eye Services indicate Bradley continued to drive after the September 30, 2013 DLI; on December 5, 2014, Bradley complained of "difficulty seeing traffic signs and driving at night secondary to hazy vision." T. 350. Bradley's ability to drive, and the lack of any doctor-imposed restrictions on Bradley's driving before the DLI, support the ALJ's RFC determination.

### 3. **Evidence from treating doctors**

The evidence regarding Bradley's visual impairment between the alleged onset date of February 8, 2008, and November 2012, when Bradley was diagnosed with the left-eye hemorrhage, shows a diagnosis of diabetic retinopathy and visual

---

[5] Plaintiff argues Dr. Lawrence's "opinion was based on a markedly incomplete record including only two examinations [in] November 2012 and January 2013." ECF Doc. 25 at 3. It is unclear from the record whether Dr. Lawrence reviewed additional evidence from Briggs Vision Group and Georgia Retina. T. 74-79. Regardless, Dr. Lawrence did review the most pertinent evidence, as the January 2013 examination was the last evidence regarding Bradley's vision before the DLI.

acuity ranging from 20/20 to 20/40. T. 462-66. The ALJ correctly stated the November 2012 left-eye hemorrhage was a "temporary condition" that was addressed in follow-up visits. T. 33 (citing Dr. Stoltz's November 26, 2012 consultation for the left-eye hemorrhage). After a successful left eye vitrectomy, Dr. Stoltz noted on January 7, 2013, that Bradley's left-eye visual acuity had returned to 20/40, and he was able to perform all activities. T. 301. Dr. Stoltz's January 2013 treatment note—the last evidence regarding Bradley's visual impairment which predates the September 30, 2013 DLI—supports the ALJ's RFC assessment.

The record also contains evidence post-DLI.[6] These medical records, however, do not show Bradley suffered from a severe vision impairment which limited his abilities before the DLI. Instead, they show, as Bradley admitted during the reconsideration of his DIB application, that his vision deteriorated in 2015, after the DLI. T. 85 (Bradley "stated that his condition has gotten worse and he has complications due to previous eye surgery which left a hole in his eye. [Bradley] stated that the vision in the right eye has decreased half the amount tha[t] it was last year.").[7] This admission is consistent with the treatment records, which show decreasing right-eye visual acuity and more subjective complaints from Bradley

---

[6] The next evidence is from February 2014. T. 356, 451-452. It shows Bradley complained of decreased vision in his right eye and floaters which had lasted about a week. T. 451.
[7] On December 16, 2014, Bradley visited Dr. Stoltz and reported blurry peripheral vision in his right eye which was getting worse. T. 442. Dr. Stoltz recommended epiretinal membrane removal in the right eye, which occurred on January 8, 2015. T. 441, 443.

Case No. 3:21cv681-LC-HTC

regarding his vision at the end of 2014 and in 2015. T. 427-44. Therefore, the evidence after the DLI does not undermine the ALJ's findings regarding the severity of Bradley's visual impairment before the DLI. *See Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979) (holding substantial evidence supported ALJ's denial of benefits where medical evidence showed the claimant's condition deteriorated after expiration of his insured status). Indeed, some of the post-DLI evidence supports the ALJ's assessment of Bradley's RFC, as it shows that even after the DLI, Dr. Stoltz noted Bradley was "able to perform all activities" on March 7, April 4, and July 25 of 2014. T. 445, 447, 449.

### 4. Evidence supporting sitting and standing limitations

Plaintiff's memorandum devotes a short, two-sentence paragraph to arguing the ALJ failed to explain: (1) how she determined Bradley could perform tasks which allowed him to alternate between sitting and standing once every 30 minutes for 5 to 10 minutes without increasing time off task; or (2) how this limitation addressed Bradley's impairments and limitations. ECF Doc. 19 at 16. Plaintiff, however, does not cite any evidence in her memorandum or reply which undermines this portion of the RFC or supports her argument. Plaintiff does not even identify which of

Bradley's impairments would have caused additional limitations not found in the RFC.[8]

Nevertheless, the undersigned has reviewed the record and concludes substantial evidence supports the ALJ's RFC finding regarding Bradley's ability to sit and stand. Nothing in the medical evidence suggests Bradley could not meet the physical demands of the ALJ-formulated RFC. As the ALJ noted, none of Bradley's doctors submitted opinions indicating that before the DLI he had exertional limitations that were expected to last for at least twelve months. T. 33-34 ("[T]here were no apparent restrictions from any of his doctors."; "[N]o treating or attending physician's opinions, consistent with the relevant period, were submitted or provided.").

The ALJ also noted "[n]umerous examinations completed up to September 30, 2013 (the DLI), show normal muscle tone, normal strength, and good cardio-pulmonary picture." T. 33. This finding is supported in part by the results of physical examinations in February 2008 and December 2012, which yielded normal results. T. 324, 1732, 1802-03. Similarly, Dr. Cousins' January 9, 2014 examination

---

[8] The Court's briefing order advised Plaintiff: (1) she had "the burden to demonstrate Defendant's decision to deny benefits was incorrect"; (2) her "memorandum shall set out the factual and medical matters **relevant to the issues argued** and shall specifically cite the record, as filed by the Defendant, by page number for factual contentions"; and (3) "[a] general allegation that the ALJ's findings are unsupported by substantial evidence is insufficient." ECF Doc. 14 at 1-2 (emphasis in original).

showed that shortly after the DLI, Bradley's physical condition was normal.  T. 372. These examinations lend additional support to the ALJ's RFC assessment.

Lastly, the ALJ noted Bradley received treatment for respiratory congestion around September 2013, "after returning from traveling outside of the country for a couple of weeks."  T. 32 (citing T. 318).  The ability to travel internationally (whether by plane or car) for multiple weeks supports the ALJ's assessment of Bradley's exertional limitations.  Based on the foregoing, substantial evidence supports the ALJ's finding regarding Bradley's ability to sit and stand.

### C. The ALJ properly considered the "opinions" of Dr. Briggs and Dr. Stoltz

Plaintiff contends the ALJ's decision "fails to address the treating medical source opinions from Dr. Briggs and Dr. Stoltz, resulting in outcome determinative error."  ECF Doc. 19 at 16-17.  Plaintiff takes issue with the ALJ's assertion that "no treating or attending physician's opinions, consistent with the relevant period, were submitted or provided."  T. 33-34.  Plaintiff points out Dr. Briggs cautioned Bradley against "running" or "lifting" on November 24, 2012, T. 458, and Dr. Stoltz advised him not to perform strenuous activity on December 28, 2012, T. 304.

"An ALJ must evaluate every medical opinion received and assign weight to each opinion." *Alvarez v. Comm'r of Soc. Sec.*, 848 F. App'x 823, 825 (11th Cir. 2021) (citing *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)).  The regulations governing Bradley's claim define "medical opinions" as "statements

from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1) (applicable to claims filed before March 27, 2017).

Here, Plaintiff admits the statements from Drs. Briggs and Stoltz "related to the period of time in which the hemorrhage and post-surgical recovery occurred," but argues Bradley "experienced ongoing eye hemorrhages, which indicates such limitations would be applicable on an ongoing basis and were not temporary in nature." ECF Doc. 19 at 20. However, this argument is not supported by the record as it relates to the period at issue. The record reflects the November 2012 eye hemorrhage is the only one that occurred between the alleged onset date and the DLI; Dr. Stoltz treated it successfully with surgery. Although Bradley experienced additional hemorrhages after the September 30, 2013 DLI, those post-DLI hemorrhages do not provide a basis for transforming these doctors' pre and post operative instructions into permanent functional limitations which existed before the DLI. The temporary nature of these restrictions is confirmed by Dr. Stoltz's January 7, 2013 post-operative treatment note, which omitted any such limitations and stated Bradley was able to perform all activities. T. 301-02.

In sum, nothing in the record suggests the doctors' statements reflected their opinions of Bradley's permanent functional limitations. Accordingly, because the statements from Drs. Briggs and Stoltz did not relate to Bradley's permanent functional limitations, they did not constitute a medical opinion which the ALJ was obligated to assign a weight. *Cf. Alvarez*, 848 F. App'x at 825 (concluding ALJ did not err in failing to articulate the specific weight given to doctors' records when the records did not address claimant's functional limitations or how his conditions affected his ability to work).

V. **CONCLUSION**

The ALJ's RFC determination is supported by substantial evidence, including Dr. Lawrence's opinion, Bradley's ability to drive and travel, and the treatment notes, which showed normal examinations and successful treatment before the DLI, and deterioration after the DLI. Also, the ALJ's failure to assign a particular weight to the statements of Dr. Briggs and Dr. Stoltz does not constitute reversible error because those statements were not medical opinions regarding Bradley's functional ability.

Accordingly, it is RECOMMENDED:

1. That the Commissioner's decision be AFFIRMED and Bradley's application for Disability Insurance Benefits be DENIED.

2. That the clerk be directed to enter judgment in favor of the Commissioner and close the file.

At Pensacola, Florida, this 15th day of July, 2022.

*/s/ Hope Thai Cannon*
**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within **fourteen (14) days** of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> An objecting party must serve a copy of its objections upon all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.